Argued and submitted November 7, 2006, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings March 29, 2007

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## LEONARD CONTRERAS SANDOVAL,
*Petitioner on Review.*

## (CC 01CR0641; CA A119980; SC S53457)

156 P3d 60

Peter Gartlan, Chief Defender, Legal Services Division, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services.

Janet A. Klapstein, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before De Muniz, Chief Justice, and Carson, Gillette, Durham, Balmer, Kistler, and Walters, Justices.**

GILLETTE, J.

---

** Carson, J., retired December 31, 2006, and did not participate in the decision of this case. Linder, J., did not participate in the consideration or decision of this case.

## GILLETTE, J.

Defendant appealed his conviction after a jury trial on a charge of intentional murder, ORS 163.115(1)(a), contending that the trial court improperly instructed the jury to the effect that a person is justified in using deadly force in self-defense to defend against imminent use of deadly force by another only if there is no opportunity to escape and no other means of avoiding the combat. A panel of the Court of Appeals affirmed defendant's conviction without opinion. *State v. Sandoval*, 204 Or App 457, 130 P3d 808 (2006). We allowed defendant's petition for review and now conclude that the instruction was an incorrect statement of Oregon law and that the trial court's error in giving the instruction was not harmless. Accordingly, we reverse the decision of the Court of Appeals, reverse defendant's conviction for intentional murder, and remand the case to the circuit court for further proceedings.

Defendant shot and killed his ex-wife's domestic partner, Whitcraft. The two men had a history of combative and sometimes physically violent interactions. The shooting occurred on a road that both men frequently traveled. When the police arrived on the scene, defendant described the following sequence of events: Whitcraft had driven by on the road as defendant was about to turn onto it; after defendant turned onto the road behind Whitcraft, Whitcraft stopped his truck and backed it into defendant's truck; Whitcraft then turned and aimed a pistol at defendant; defendant grabbed a rifle that he was carrying in his own vehicle (both men kept guns in their vehicles), opened the door of his truck and fired a single shot at Whitcraft. Investigators determined that the shot had entered Whitcraft's skull behind his left ear, killing him instantly. Police later found Whitcraft's loaded and cocked pistol under Whitcraft's body.

At trial, the state rejected defendant's version of the events and offered evidence that defendant had essentially ambushed Whitcraft—provoking him until he stopped his truck, training a rifle on him until he reached for his gun, and then shooting him in the head. At the close of trial, the court gave a series of jury instructions that were drawn from Uniform Criminal Jury Instructions:

"A person is justified in using physical force upon another person to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force. In defending, a person may only use that degree of force which he reasonably believes to be necessary.

"The burden of proof is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense.

"* * * * *

"There are certain limitations on the use of deadly physical force. The defendant is not justified in using deadly physical force against another person in self-defense unless he reasonably believed that the other person was using or about to use unlawful deadly physical force against him and/or committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person.

"Even in the situation where one of these threatening circumstances is present, the use of deadly physical force is justified only if it does not exceed the degree of force which defendant reasonably believes to be necessary in the circumstances."

Over defendant's objection, the court then gave an additional special instruction that the prosecution had requested:

"The danger justifying the use of deadly force must be absolute, imminent, and unavoidable, and a necessity of taking human life must be actual, present, urgent and absolutely or apparently absolutely necessary. There must be no reasonable opportunity to escape to avoid the affray and there must be no other means of avoiding or declining the combat."[1]

As we shall explain, that instruction apparently was based, not on the statutes discussed below, but on this court's 1982 opinion in *State v. Charles*, 293 Or 273, 647 P2d 897 (1982). The jury subsequently found defendant guilty of intentional murder with a firearm, apparently rejecting defendant's claim of self-defense.

---

[1] There is no transcript of defendant's objection, but the parties agree that defendant did object that the special instruction was not an accurate statement of the law.

On appeal, defendant assigned error to the trial court's decision to give the special instruction. As noted, the Court of Appeals affirmed without opinion. Petitioner then sought review by this court, and we allowed his petition to consider whether the "duty to retreat" instruction that the trial court gave is a correct statement of Oregon law.

The answer to that question resides in the criminal statutes that define the concept of self-defense for purposes of Oregon law. Two merit discussion. The first, ORS 161.209, describes when the use of physical force for self-defense is "justified" and, thus, lawful:

> "Except as provided in [another statute, not pertinent to this case] and [ORS] 161.219, a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose."

The cross-referenced statute, ORS 161.219, deals specifically with the use of *deadly* physical force. It provides:

> "Notwithstanding the provisions of ORS 161.209, a person is not justified in using deadly physical force upon another person unless the person reasonably believes that the other person is:
>
> "(1)  Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or
>
> "(2)  Committing or attempting to commit a burglary in a dwelling; or
>
> "(3)  Using or about to use unlawful deadly physical force against a person."

Our initial task is to determine, from the text and context of the foregoing statutes, whether the legislature intended to limit the availability of the right to use deadly physical force for self-defense to those circumstances in which the person had no opportunity to retreat (or, as the special instruction had it, "no reasonable opportunity to escape to avoid the affray and * * * no other means of avoiding or declining the combat"). *See PGE v. Bureau of Labor*

*and Industries,* 317 Or 606, 610, 859 P2d 1143 (1993) (describing analytical method for construing statutes). If, after that initial examination, the legislature's intent with respect to the existence of a duty to retreat still is unclear, we may proceed to an examination of legislative history. *Id.* at 611-12.

On a purely textual level, ORS 161.219 contains no specific reference to "retreat," "escape," or "other means of avoiding" a deadly confrontation. Neither, in our view, does it contain any other wording that would suggest a duty of that kind. Instead, it sets out, in straightforward terms, a set of circumstances that justify a person's use of deadly force (a reasonable belief that another person is using or about to use deadly force against a person) and does not purport to interpose any additional requirements beyond those circumstances.

The state contends that a duty to retreat nonetheless is implied by what it describes as a "necessity" concept that it asserts is at the heart of both ORS 161.219 and the basic self-defense statute, ORS 161.209. However, the state does not explain its construction in terms of the specific wording of either ORS 161.209 or ORS 161.219. It simply states, without further elaboration, that the central nature of a concept of necessity is "demonstrate[d]" in "the text of the interrelated statutes," *i.e.,* ORS 161.219 and ORS 161.209.

The state may be relying on the fact that the latter statute contains the word "necessary." However, assuming that ORS 161.209 is relevant to our inquiry, it is clear that the reference to "necessary" in that statute pertains to the *degree* of force, which a person threatened with unlawful force reasonably believes to be required for the purpose of self-defense or defense of another. That wording assumes a right to meet unlawful force with *some* level of force and does not suggest that a decision to retreat or otherwise forego the use of the otherwise permissible level of force might be required in some circumstances.

Neither are we persuaded that a duty to retreat may be derived from the requirement in ORS 161.209 that an attacker's use of unlawful physical force be present or "imminent." That requirement speaks solely to the timing of the

threat; it is not concerned with the nature of the threatened person's response.[2] In short, nothing in the wording of ORS 161.219 itself, or in its broader counterpart, ORS 161.209, suggests that persons who reasonably believe that another person is about to use deadly physical force against them must calculate whether it is possible to retreat from that threat before they use deadly physical force in self-defense.

The state argues that this court's decision in *Charles* is relevant at this stage of our analysis as part of the statute's context. The state asserts, specifically, that *Charles* interpreted ORS 161.219 as imposing a duty of retreat on those who would rely on a self-defense theory to justify their own use of deadly force against another. The state then asserts that *Charles* is precedent that binds us here.

The state's reliance on *Charles* is understandable. In that case, this court rejected a defendant's claim that the trial court had erred in refusing to instruct a jury that a person has no duty to retreat before using deadly force to defend against an imminent use of deadly force by another. The court there stated that such an instruction would be contrary to "the Oregon cases, [which] require a defendant * * * to avoid the threatened danger where it is possible to do so without sacrificing his own safety." 293 Or at 284. The problem with that pronouncement, however, is that the court based that decision entirely on its analysis of "the Oregon cases," while the right of self-defense is set out in the two statutes previously discussed.

Indeed, the entire analytical flow of the *Charles* opinion is distinctly odd: The court did not examine the wording of either ORS 161.209 or ORS 161.219 *at all*. Instead, the court set out the wording that the Oregon Criminal Law Commission had *proposed* to the legislature regarding the use of deadly force as part of the final draft of the proposed 1971 Criminal Code, which wording explicitly imposed a duty of retreat to avoid the necessity of using deadly force. Then,

---

[2] If a particular danger is *not* imminent, a person who wishes to escape criminal liability may well be required to avoid the danger, rather than to seek it out and cause that danger to become imminent. *See* ORS 161.215(2) (self-defense not available if accused was initial aggressor). But the scope of the statutes that we consider here applies only to dangers that *are* "imminent."

after noting that the 1971 legislature had *rejected* that wording, the court cited a view expressed in the Oregon Criminal Law Commission's Commentary to the 1971 Code to the effect that "the statute probably was not necessary" because of existing Oregon case law. 293 Or at 278 (discussing Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 23, at 23-25 (July 1970)). Then, without discussing at all the fact that the Oregon legislature had adopted statutes on the subject, the court concluded, inexplicably, that "Oregon case law * * * controls the subject." 293 Or at 277. The court then went on to discuss its prior cases (and to conclude that they did not support the defendant's claim that Oregon does not recognize a "duty of retreat").

Although, from our present perspective, it seems surprising that this court would attempt to answer the question presented in *Charles* without resort to the controlling criminal statutes, that is precisely what the *Charles* court did. The court's analysis did not focus on or even consider the words of the statutes that we now recognize to be pivotal. Neither did the court conclude, as the state suggests, that the drafters of ORS 161.219 had decided to "continue" the "common-law rules" as explicated in the various self-defense cases that preceded the enactment of that statute. *Charles*, therefore, has nothing to contribute to our present effort, which is to discern what the *legislature* intended with respect to the "duty of retreat" question.

■ Without *Charles*, we are left with our initial impression of the statute: It sets out a specific set of circumstances that justify a person's use of deadly force (that the person reasonably believes that another person is using or about to use deadly force against him or her) and does not interpose any additional requirement (including a requirement that there be no means of escape). That impression is not altered by the requirement in ORS 161.219 that the use of deadly force be present or "imminent," or by the same statute's reference to "the degree of force which the person reasonably believes to be necessary." We conclude, in short, that the legislature's intent is clear on the face of ORS 161.219: The legislature did *not* intend to require a person to retreat before

using deadly force to defend against the imminent use of deadly physical force by another.

■    It follows from the foregoing that the trial court erred in giving the instruction in question. The state contends, however, that, even if that is so, the error was harmless, because the facts and legal theories that the parties presented to the jury simply did not involve any question of retreat or whether use of deadly force was unavoidable. Rather, the state argues, the factual dispute before the jury focused solely on the question of whether Whitcraft had resorted to his weapon first. The state contends that, under those circumstances, there was little likelihood that the disputed instruction affected the outcome of the case.

We disagree with the state's assessment. A jury presented with the disputed instruction would assume that it had *some* relevance to the case before it. Even if the state never specifically made the argument, and even if its factual case was not geared to that issue, the jury still would be likely to hear the instruction as requiring it to find that defendant had had no opportunity to retreat from or otherwise "avoid the affray" before it could accept defendant's self-defense theory. With that erroneous impression in mind, the jury may have rejected defendant's self-defense claim based on a finding that defendant could have driven away when he saw Whitcraft backing toward him (or, even better, when he first saw Whitcraft drive by).[3] In short, there is every likelihood that the erroneous instruction affected the verdict. The error was not harmless.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[3] Indeed, the instruction hammered at the idea, using phrases borrowed from several of the cases discussed in *Charles*. Constructing instructions from an amalgam of cases, snatching verbal snippets from each, rarely produces truly accurate instructions, as this case demonstrates. We think, in fact, that it would be fair to say that even the *Charles* court would have found that state's special instruction a bit strong.